UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------ x

KRASNYI OKTYABR, INC. (a/k/a, "Red
October"),                                          <u>MEMORANDUM AND ORDER</u>
                                                    Civil Action No.
      Plaintiff,       CV-05-5359

    -against-

TRILINI IMPORTS, TRILINI
INTERNATIONAL IMPORTS, LLC,
INTERPAGE INTERNATIONAL LLC,
TRILINI INTERNATIONAL LTD., ROMAN
KATSNELSON, LEONID KERZHNER,
MALVINA KERZHNER, and "JOHN DOE"
DEFENDANTS 1-10, being the
remaining principals, officers,
directors, members and stockholders
of the corporate defendants,

      Defendants.
------------------------------------ x


TRAGER, J.

    Plaintiff Krasnyi Oktyabr ("Red October" or "plaintiff")

purports to have an exclusive license from a Russian manufacturer

to import certain Russian candies into the United States for sale

to the "Russian ethnic market."  Notwithstanding plaintiff's

license, defendant Trilini Imports and its related companies and

officers (collectively, "defendants") began importing the same

Russian chocolates, which they claim to have purchased from third

parties who obtained them from the Russian manufacturer.  Rather

than sue the Russian manufacturer for breach of contract,

plaintiff commenced this action against defendants alleging

trademark infringement in violation of Section 32(1) of the

Lanham Act, 15 U.S.C. § 1114 and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125. Plaintiff also brings supplemental state law claims of unfair competition, violations of §§ 349, 350 and 360-1[1] of New York's General Business Law and tortious interference with prospective business relations against defendants.

Defendants counter that plaintiff's claims fail because plaintiff has no standing to bring the Lanham Act claims and, moreover, that the goods in question were genuine so that there could be no consumer confusion. Finally, defendants assert that plaintiff has presented insufficient evidence to support the supplemental claims. This court previously denied a motion to dismiss this case on grounds of standing brought by defendants in 2007. See Krasnyi Oktyabr, Inc. v. Trilini Imps., No. CV-05-5359, 2007 WL 1017620 (E.D.N.Y. Sept. 25, 2007) ("Trilini I").

Pursuant to Rule 56(c), the parties cross-move for summary judgment on plaintiff's claims. Additionally, the parties cross-move for summary judgment on defendants' counter-claims that plaintiff is guilty of abuse of process, committed fraud on the U.S. Patent and Trademark Office ("USPTO"), violated antitrust laws and has tortiously interfered with defendants' prospective business relations. Plaintiff opposes defendants' counter-claims on grounds that they are wholly meritless.

---

[1] N.Y.G.B.L. § 360-1 is the current version of N.Y.G.B.L. § 368-d, which was repealed effective January 1, 1997.

## Background

## (1)

## The Parties

Many of the facts were already recited in the previous opinion and will only be briefly summarized.  See <u>Trilini I.</u>  Plaintiff is a Brooklyn-based importer and distributor of Russian candy marketed under the Krasnyi Oktyabr, Rot Front and Babayevsky trademarks.  <u>Trilini I</u>, at *1.  Defendants are also New York-based importers and distributors of Russian goods.  <u>Id.</u>

Obeyediyonne Conditery ("United Confectioners") is a Russian holding company which owns and runs Moscow Confectionary Factory of Krasnyi Oktyabr ("Red October Moscow"), Rot Front and Confectionary Concern Babayevsky ("CCB"), the manufacturers, respectively, of the Krasnyi Oktyabr, Rot Front and Babayevsky brands of candy.  <u>Id.</u>  Plaintiff and United Confectioners are wholly unrelated to one another.  Dec. of Charles H. Knull in Supp. of Defs. Mot. for Summ. J. ("Knull Dec."), Ex. A (Dep. of Gregory Kachura ("Kachura Dep.")) at 10-11, 25-26.

## (2)

## Plaintiff's Agreements

On April 9, 1996, plaintiff entered into a licensing agreement with Red October Moscow granting plaintiff an exclusive

license to use the "Krasny[i] O[k]tyabr[2]" trademarks in the
United States.  Knull Dec., Ex. J (1996 Licensing Agreement on
Trademarks ("1996 Agreement")), ¶ 1.1.  In late 1999, plaintiff
obtained a United States trademark registration for the "Krasnyi
Oktyabr" brand from the USPTO.  Knull Dec., Ex. F (USPTO
Registrant Information for the Two "KRASNYI OKTYABR" marks
("USPTO registrations")).  Plaintiff obtained a trademark
registration for a second "Krasnyi Oktyabr" logo in 2001.  Id.

Acting on behalf of United Confectioners, on April 5, 2005,
Rot Front entered into an additional agreement with plaintiff.[3]
The agreement granted plaintiff the exclusive right to sell the
"Krasnyi Oktyabr," "Rot Front" and "Babayevsky" brands to the
"Russian Ethnic Market" in the United States.  Knull Dec., Ex. E
(AGREEMENT #581006 ("2005 Agreement")), ¶¶ 2.1, 2.12.  Pursuant
to this agreement, plaintiff assigned "the entire right, title,
and interest" in both of its "Krasnyi Oktyabr" trademarks to Red

---

[2] The Russian name "Краный Октяърь" has been spelled several
different ways on submitted documents, including "Krasny
Octyabr," "Krasnyi Octyabr," "Krasnyj Octyabr" and "Krasnyi
Oktyabr."  This opinion will use the spelling "Krasnyi Oktyabr"
and demarcate any changes from the original document with [].

[3] The parties dispute the classification of the 2005
Agreement between plaintiff and Rot Front.  Plaintiff refers to
it as the "2005 Licensing Agreement," while defendants refer to
it as the "2005 Distributorship Agreement."  Although on its face
the 2005 Agreement is a contract between Rot Front and plaintiff,
the Managing Director of United Confectioners attests that Rot
Front made the agreement on behalf of United Confectioners.
Nosenko Aff. ¶ 3.

October Moscow.  Knull Dec., Ex. I ("Trademark Assignment").

**(3)**

**Defendants' Conduct**

United Confectioners' Managing Director has affirmed that plaintiff is the only company that has contracted with United Confectioners to distribute its candy in the United States.  Aff. of Sergey Kolos ("Kolos Aff."), ¶ 6. Notwithstanding plaintiff's exclusive agreement, starting on or about April 5, 2005, defendants began importing and selling Krasnyi Oktyabr, Rot Front and Babayevsky chocolate bars and confections in the United States at prices below plaintiff's.  Dec. of Matthew Sheppe in Opp. to Defs. Mot. on Summ. J. ("Sheppe Opp. Dec."), Ex. E ("Kachura Aff."), ¶ 12.  Defendants purchased the candy from third parties, Russian distributors who obtained it directly from United Confectioners.  Dec. of Malvina Kerzhner in Opp. to Pl's Mot. for Part. Summ. J. ("M. Kerzhner Dec."), ¶ 2.  The packaging of the candy sold by defendants appears indistinguishable from that sold by plaintiffs.

In September of 2005, a representative of United Confectioners informed Malvina Kerzhner, one of the defendants, that United Confectioners would not sell defendants candy of the Krasnyi Oktyabr, Rot Front, and Babayevsky brands, but they remained free to purchase candy from United Confectioners' other

5

brands.  Knull Dec., Ex. C ("M. Kerzhner Dep."), at 53-54.

Defendants continued selling the candy after this notification

and on October 19, 2005 two of plaintiff's employees were able to

purchase an assortment of Krasnyi Oktyabr, Rot Front and

Babayevsky goods directly from defendants.  Kachura Aff. ¶ 13.

Plaintiff has not presented any evidence, nor does it claim, that

the candy it purchased from the defendants differs from the candy

plaintiff sells.  Plaintiff claims that it is losing business

because some of its customers had already purchased from

defendants.  Kachura Aff. ¶ 15.

### (4)
### Quality Control Standards

The central factual dispute in determining whether

defendant's goods are genuine focuses on any differences between

plaintiff's and defendants' quality control standards.  The

parties do not dispute that the candy sold by defendants

originated from the factories of one of United Confectioners'

companies.  M. Kerzhner Dec., ¶ 3.  Plaintiff claims that the

candy it sells has been selected for export, and is subjected to

higher quality control standards than candy defendants sell,

which has been selected for sale on the Russian domestic market.

In support of this assertion it relies on a 2001 declaration from

the director of the export department of Red October Moscow,

which was originally submitted in a different case.  Sheppe Opp. Dec., Ex. C ("Privezentsev Dec."), ¶¶ 9-15.  Plaintiff further contends that its contract with United Confectioners obliges it to follow strict quality control standards for the transport and storage of the candy, whereas defendants are not contractually obliged to follow such standards.  Kolos Aff. ¶¶ 4, 7-11. Because defendants are not contractually obliged to follow such standards, plaintiff argues, there is a high likelihood that defendants will sell expired or stale candy.  Kachura Aff., ¶ 17. Nowhere, however, does plaintiff explain what exactly these alleged quality control standards require.

Defendants dispute plaintiff's contentions, arguing that there is no difference in the quality of the candy sold for domestic consumption in Russia and for export.  Dec. of Leonard Kerzhner in Supp. of Defs. Mot. ("L. Kerzhner Dec."), ¶ 10. Defendants agree that they are not contractually obliged to follow any of United Confectioners' quality control standards, but contend that their candy is nevertheless subjected to quality control standards that conform to industry norms.  Sheppe Opp. Dec., Ex. B ("L. Kerzhner Dep.") at 65-67.  Defendants further claim that they do not sell expired candy and that their candy is of the same quality as the candy sold by plaintiff.  M. Kerzhner Dec., ¶¶ 8, 12.

## Discussion

## (1)

## Plaintiff's Standing Under the Lanham Act

Plaintiff claims that defendants' import and sale of candy infringes on its trademark rights under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114. It further claims that defendants falsely designated the origin of the candy and misrepresented facts in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125. Defendants, as a preliminary matter, counter that plaintiff has no standing to bring an action under either section of the Lanham Act.

## a. Plaintiff's Standing under Section 32 of the Lanham Act

This court previously denied defendants' motion to dismiss based on standing under Section 32 of the Lanham Act, finding based on the allegations in the complaint and the documents attached thereto that plaintiff had standing as a legal representative. In particular, plaintiff's legal representative status was supported by the 2005 Agreement, which granted it certain trademark usage rights, and authorization from S.M. Nosenko, Managing Director of United Confectioners, to act as an agent of United Confectioners in protecting its trademark rights. Trilini I, at *4. By re-arguing plaintiff's standing, defendants are revisiting an issue that has already been decided.

Rather than move for reconsideration under Fed. R. Civ. P. 59(e) or 60(b), defendants raised the issue for a second time in their motion for summary judgment without acknowledging the court's earlier ruling. Ordinarily, under the law of the case doctrine, a decision of law made at one stage of a case will continue to govern in subsequent stages of the same case. United States v. Thorn, 446 F.3d 378, 383 (2d Cir. 2006) (citations omitted). However, the law of the case doctrine is discretionary, particularly when the initial ruling is made on a motion to dismiss and the issue is subsequently raised again after fact discovery in a motion for summary judgment. See DeStefano v. Miller, 67 F. Supp. 2d 274, 280 (S.D.N.Y. 1999), vacated in part on other grounds by De Stefano v. Emergency Housing Group, Inc., 247 F.3d 397 (2d Cir. 2001).

Defendants offer no new evidence, but offer new arguments that plaintiff's interpretation of standing as legal representative is overly broad and that by granting standing to plaintiff, the real party in interest, United Confectioners, is effectively being shielded from discovery. Plaintiff, presenting evidence only of its own damages, argues that it may protect not only United Confectioners' rights, but its own rights as exclusive distributor.

In its broadest sense, a representative can be seen as "one who stands for or acts on behalf of another." Black's Law

Dictionary, Revised 8th Ed. (2004).  More narrowly, a legal representative can be viewed as one who "manages the legal affairs of another because of incapacity or death, such as the executor of an estate."  Id.  The issue of who is a legal representative under Section 32 has not been widely litigated, but a district court in Washington took the position that a legal representative under Section 32 should follow the historically restrictive interpretation given to "registrant" and should not be "contrary to the ordinary meaning of the term, i.e.[,] one who appears on behalf of a party who is otherwise unable or incapable of doing so, for example by a guardian of a minor or an administrator of an estate."  Nat'l Licensing Assoc., LLC v. Inland Joseph Fruit Co., 361 F. Supp. 2d 1244, 1255 (E.D. Wash. 2004) (emphasis in original).

Plaintiff has not cited any legal authority that supports a departure from the ordinary meaning of legal representative to act "on behalf" of another.  Thus, under a theory of legal representative, plaintiff may only recover under Section 32 for damages incurred by United Confectioners.  Any damages that plaintiff may have incurred personally may not be recovered under this section.

Plaintiff, however, has not offered any evidence of damages to United Confectioners.  It has long been established that the constitutional minimum for establishing standing requires that a

party suffer "an 'injury in fact' - an invasion of a legally
protected interest which is (a) concrete and particularized and
(b) 'actual or imminent, not conjectural or hypothetical.'" <u>Port
Wash. Teachers' Ass'n v. Board of Educ.</u>, 478 F.3d 494, 498 (2d
Cir. 2007) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555,
560 (1992)).  Although plaintiff conjectures that defendants'
conduct may have caused harm to United Confectioners, even after
discovery, the evidence plaintiff presents of damages viewed in
the light most favorable to it is insufficient to show lost
profits by United Confectioners arising from defendants' conduct.

   Plaintiff states that it would have paid $69,452.97 to
purchase the same goods from United Confectioners that defendants
purchased from its Russian supplier, Russkie Produkty Torg, for
$73,661.27.  Kachura Aff. ¶ 9; Sheppe Dec., Ex. D (Invoice No.
01/179E ("Russkie Produkty Torg Invoice")).  Neither party
presents evidence of what Russkie Produkty Torg paid United
Confectioners for the goods. However, given that defendants paid
approximately $4,200.00 more for the goods than plaintiff would
have paid to purchase them directly from United Confectioners, it
is entirely possible that Russkie Produkty Torg paid United
Confectioners the same amount or even more for the goods as
plaintiff would have paid.  Under this scenario United
Confectioners would not have suffered any lost profits.

   Under a second scenario, if Russkie Produkty Torg paid

United Confectioners less than plaintiff, United Confectioners may still not have suffered lost profits. Plaintiff presents evidence that United Confectioners sells candy for export at higher prices than candy for domestic consumption in order to cover the increased costs of the export department. Privezentsev Dec. ¶ 15. This evidence, while demonstrating a loss in revenue, does not necessarily mean that United Confectioners obtains a greater profit from candy sold for export.

Even if plaintiff could demonstrate damages incurred by United Confectioners, its standing claim still fails because it has not provided a reason why United Confectioners, the real party at interest, cannot participate in the litigation. Fed. R. Civ. P. 19(a)(1) provides that if joinder is feasible a party must be joined if:

> (A)[I]n that person's absence, the court cannot accord complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Plaintiff has neither demonstrated that defendants' case has not been impaired by their potential difficulty in obtaining discovery from United Confectioners, a foreign third-party, nor shown that United Confectioners cannot bring subsequent infringement claims against defendants. In <u>Visa U.S.A., Inc. v. First Data Corp.</u>, No. C 02-01786, 2005 U.S. Dist. LEXIS 37276, at

*13-15 (N.D. Cal. Aug. 16, 2005), the court found that in order for a non-exclusive licensee to sue as legal representative it must have "exclusive enforcement rights to the disputed marks." The facts of <u>Visa</u> bear substantial resemblance to the present case.  In <u>Visa</u>, the licensor, in a written agreement with the licensee, expressly retained ownership of the marks and "the sole right to engage in infringement or unfair competition proceedings involving [the marks]." <u>Id.</u> at *5.  During discovery plaintiff produced a letter memorializing a previous oral agreement made prior to the filing of the complaint whereby the licensor authorized the licensee to institute an infringement suit against defendants on its behalf.  <u>Id.</u>  The court found under such facts that the licensor had not relinquished its rights to sue defendants and consequently the licensee could not "maintain status of legal representative for the unique purpose of conferring upon itself standing to sue in this limited circumstance." <u>Id.</u> at *14-15.

In the present case, while at one time plaintiff may have had exclusive rights to sue for infringement against the Krasnyi Oktyabr trademarks, it is undisputed that in 2005 plaintiff assigned the trademarks including all potential infringement claims for the Krasnyi Oktyabr trademarks to United

Confectioners.[4]  The Trademark Assignment reads:

> [Red October] does hereby sell, assign, and transfer
> unto said Assignee all rights, title and interest in
> and to said Marks . . . and further including, without
> limitation, all claims for damages by reason of past
> infringement and the right to sue for and the right to
> collect the same for its own use and [behalf], and for
> the use and [behalf] of its successors, assigns, or
> legal representatives and the right to defend the Marks
> and the applications and registrations thereof.

Subsequent to the assignment plaintiff has only offered
evidence that United Confectioners orally authorized it to bring
claims on its behalf.  Nosenko Aff. ¶ 6 reads:

> If any court, for any reason whatsoever, shall
> determine that the above agreements do not grant "Red
> October USA" the right to commence such enforcement
> actions with respect to the trademarks, this position
> will serve as a permit issued by OOO "United
> Confectioners," effective as of April 5, 2005 for
> trademarks of OAO "Rot Front" and OAO "Babayevsky", and
> as of August 8, 2005 for the trademarks of OAO "Red
> October," authorizing "Red October USA" to act as an
> agent for products made by OAO "Red October," OAO "Rot
> Front," and OAO "Babayevsky" in the matter of
> exercising full rights and remedies in accordance with
> the provisions of its trademarks, including any pending
> civil actions, and any and all similar actions that may
> be initiated in the future.

For the present litigation it may have been convenient for
plaintiff to bring this action on behalf of United Confectioners,
but this authorization fails to grant exclusive enforcement
rights to plaintiff.  The authorization does not prevent United
Confectioners from bringing a further claim against defendants or

---

[4] Plaintiff has offered no evidence that it has ever
possessed exclusive rights to sue for infringement of the
Babayevsky or Rot Front trademarks.

any subsequent infringers.  Accordingly, defendants' cross-motion with respect to plaintiff's Section 32 claim on grounds of lack of standing is granted.

**b.   Plaintiff's standing under Section 43 of the Lanham Act**

Defendants also challenge plaintiff's standing to bring an action under Section 43.  In <u>Trilini I</u>, at *6, this court found that plaintiff had standing under Section 43 based on pleadings that false designation of defendants' product is likely to cause plaintiff to suffer a loss in sales.  Although defendants dispute plaintiff's standing generally, they do not dispute that plaintiff has suffered a loss of sales from their activities nor that the packaging of their candy is indistinguishable from plaintiff's.  Furthermore, defendants introduce no new evidence or compelling arguments that give the court reason to depart from its previous determination of standing under Section 43.  Accordingly, plaintiff has standing to bring an action under Section 43 of the Lanham Act.

**(2)**

**Merits of Plaintiff's claims**

**a.   Plaintiff's claims under the Lanham Act**

To establish a trademark infringement claim under Section 32(1), 15 U.S.C. § 1114, or a false designation of origin claim

under Section 43(a), 15 U.S.C. § 1125, plaintiff must establish that "it has a valid mark entitled to protection and that the defendant's use of it is likely to cause confusion." Morningside Group Ltd. v. Morningside Capital Group, L.L.C., 182 F.3d 133, 137 (2d Cir. 1999) (internal quotations and citations omitted); see also Time, Inc. v. Peterson Publ'g Co., L.L.C., 173 F.3d 113, 117 (2d Cir. 1999).[5]  Because the elements required to succeed under 15 U.S.C. § 1125 are virtually the same as under 15 U.S.C. § 1114, case law applicable to Section 32 claims applies with

---

[5]15 U.S.C. § 1114 provides:

Any person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1125 provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

equal force to Section 43 claims. Trilini I, at *8 ((citing Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986) ("[I]n either a claim of trademark infringement under § 32 or a claim of unfair competition under § 43, a prima facie case is made out by showing the use of one's trademark by another in a way that is likely to confuse consumers as to the source of the product.")).

The parties do not dispute the validity of the trademarks. Plaintiff argues that defendants' goods are not subjected to the same quality controls, thus causing a likelihood of confusion. Defendants counter that, first, the first-sale doctrine shields them from liability under the Lanham Act and, second, there can be no likelihood of confusion because the goods were genuine.[6]

"As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner. Thus, a distributor who resells trademark goods without change is not liable for trademark infringement." Polymer Tech. Corp. v. Mimran, 975 F.2d 58, 61 (2d Cir. 1992) (citations omitted). "The unauthorized sale of a genuine trademarked product does not in itself constitute trademark infringement, since there is no possibility of

---

[6] In Trilini I, the court noted that "if the defendants' goods are genuine, there is no likelihood that consumers will be confused as to the origins of defendants' product." Trilini I, at *7.

deception or confusion." H.L. Hayden Co. of NY, Inc. v. Siemens Medical Systems, Inc., 879 F. 2d 1005, 1023 (2d Cir. 1989) (citations omitted).  This principle has come to be known as the exhaustion or first-sale doctrine.  See Italverde Trading, Inc. v. Four Bills of Lading Numbered LRNNN, 485 F. Supp. 2d 187, 210 (E.D.N.Y. 2007); Ryan v. Valpone Stamp Co., 107 F. Supp. 2d 369, 382 (S.D.N.Y. 2000) (proposing a two-part test for meeting the first-sale doctrine, considering first whether the trademark owner authorized the first sale and then whether "the goods which were later sold without authorization were genuine"); see also 4 J. Thomas McCarthy, Trademarks and Unfair Competition, § 25:41 (4th ed. 2008).  Thus, defendants' first-sale doctrine defense rests on the same inquiry of whether or not the goods were genuine.

The parties do not dispute that the goods are "genuine" in the sense that they originated from the production lines of one of United Confectioners' factories.  Rather, plaintiff argues that defendants' goods cannot be considered "genuine" because they are not subjected to the same quality control procedures as plaintiff's goods.

In El Greco Leather Prods. Co., Inc. v. Shoe World, 806 F.2d 392, 395 (2d Cir. 1986), the Second Circuit held that where a trademark holder could not control the quality of the goods sold by a distributor, the goods would not be considered genuine.

"One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." Id. at 395 (citation omitted). "For this purpose the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." Id. (citation omitted).

> Thus, goods that do not meet the trademark owner's quality control standards will not be considered genuine goods, and their sale will constitute trademark infringement, for the sale of such goods could mislead consumers into believing that the trademark owner had approved the goods for domestic sale.

Helene Curtis v. Nat'l Wholesale Liquidators, Inc., 890 F. Supp. 152, 157 (E.D.N.Y. 1995) (internal quotations and citations omitted).

"To be entitled to relief, the trademark holder is not required to adopt the most stringent quality control standards available. A trademark holder must demonstrate only that: (i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark." Warner-Lambert Co. v. Northside Dev. Corp., 86 F.3d 3, 6 (2d Cir. 1994).

In the present case, plaintiff has not met its burden in demonstrating that defendants' goods are not genuine because it has not shown that defendants' goods are subjected to quality

control standards different from its own.  Plaintiff has not demonstrated any actual differences in the quality of defendants' goods.  No evidence has been presented suggesting that customers are able to discern a difference in the quality of the parties' goods or that defendants have ever sold expired goods.  Although plaintiff has purchased an assortment of all three brands of candy from defendants, it has failed to present any evidence that it could detect any actual differences in defendants' goods. Kachura Aff. ¶ 7.

Plaintiff's argument rests primarily on the potential for a difference, based on purported differences in the quality control standards at United Confectioner's factories and in the transport and storage of defendants' goods.  Plaintiff cannot argue that United Confectioners did not have an opportunity to inspect defendants' goods when they were originally manufactured. Rather, plaintiff contends that candy selected for export at United Confectioners' factories is subjected to higher quality control standards than candy selected for sale on the Russian domestic market.  Plaintiff's only evidence in support of its assertion is a six-and-a-half-year-old affidavit submitted in a previous case from the export director of Red October Moscow. The affidavit only refers to general differences in health, sanitation and aesthetic requirements, but fails to mention any specific quality control standards adhered to by the special

export department.  Privezentsev Dec. ¶¶ 9-15.  In addition to being over six years old, the affidavit refers only to the Krasnyi Oktyabr brand.[7]

Plaintiff further contends that defendants' goods are subjected to lower quality control standards in their transport and storage, based on the assumption that because defendants are not contractually bound by United Confectioners to maintain certain quality controls, their quality control standards must be inferior.  Plaintiff is, however, unable to show any specific differences.  The only quality control standard specifically mentioned by plaintiff is the temperature at which defendants' candy is stored.  Defendants assert that they store and transport their candy under a controlled temperature of approximately 18 degrees Celsius (64 degrees Fahrenheit), which they contend is in line with industry norms.  Knull Dec., Ex. L ("L. Kerzhner Dep.") at 66; M. Kerzhner Dec., ¶¶ 5-6.  Plaintiff does not dispute that defendants store and transport their goods at 18 degrees, nor does it assert that this temperature violates United Confectioners' quality control standards.  Pl's Resp. to Defs' Rule 56.1 Stat. of Undisp. Mat. Facts, ¶¶ 32, 34.  Accordingly, because plaintiff has not met its burden in showing that defendants' goods are not genuine, defendants' cross-motion with

---

[7] Plaintiff presents no evidence of any differences between the export and domestic versions of the Rot Front or Babayevsky brands.

respect to plaintiff's Section 43 claim is granted.[8]

**b.    Plaintiff's claim for unfair competition**

Both parties cross-move for summary judgment on plaintiff's claim that defendants have engaged in common law unfair competition.  In order for a plaintiff to succeed on a claim of unfair competition it must demonstrate (1) actual or the likelihood of confusion and (2) bad faith.  <u>Trilini I</u>, at *9 (citing <u>W.W.W. Pharm. Co. v. Gillette Co.</u>, 984 F.2d 567, 576 (2d Cir. 1993) (limited on other grounds by <u>Deere & Co. v. MTD Prods., Inc.</u>, 41 F.3d 39 (2d Cir. 1994)); <u>Saratoga Vichy Spring Co. v. Lehman</u>, 625 F.2d 1037, 1044 (2d Cir. 1980)).  "The first element mirrors the confusion element under both Sections 32 and 43 of the Lanham Act."  <u>Trilini I</u>, at *9.  Because the likelihood of confusion elements pertaining to plaintiff's common law unfair competition and Lanham Act claims are the same, they also require a similar factual showing.  Plaintiff has not met its burden in showing that defendants' goods are not genuine, so it is not necessary to reach the issue of bad faith.  Accordingly, defendants' cross-motion with respect to plaintiff's common law unfair competition claim is granted.

_____

[8] Because the analysis for Section 32 and 43 claims is similar, even if plaintiff had standing to bring a Section 32 claim, defendants' motion would be granted with respect to plaintiff's Section 32 claim for the same reason as plaintiff's Section 43 claim.

**c.  Plaintiff's claims under N.Y. Gen. Bus. Law § 349**

Both parties cross-move for summary judgment on plaintiff's claim that defendants have violated N.Y. Gen. Bus. Law § 349. The statute proscribes "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law § 349.  "To make out a prima facie case under Section 349, a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result."  Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000) (citing Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d 20, 25, 647 N.E.2d 741, 744, 623 N.Y.S.2d 529, 532 (1995)).  A competitor may sue under Section 349, as long as "the gravamen of the complaint [is] consumer injury or harm to the public interest."  Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995) (internal quotations and citations omitted).

A number of courts have held that "'trademark cases are outside the scope of this general consumer protection statute,'" reasoning that the public harm that results from trademark infringement is "too insubstantial to satisfy the pleading requirements of § 349."  Karam Prasad, LLC v. Cache, Inc., No. 07-cv-5785, 2007 WL 2438396, at *2 (S.D.N.Y. Aug. 27, 2007) (quoting Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC, 221

F. Supp. 2d 410, 413 n.2 (S.D.N.Y. 2002) (collecting cases).
Indeed, plaintiff asserts that it has incurred damages from lost
business.  However, the statute requires that plaintiff
demonstrate some harm to the consumer or public at large.
Because defendants' goods originate from the same manufacturer as
plaintiff's goods, and because plaintiff is unable to show a
difference in the quality control standards of defendants' goods,
plaintiff has not shown that defendants' goods are not genuine.
In this situation, plaintiff has failed to show any consumer harm
whatsoever.  Accordingly, defendants' cross-motion with respect
to plaintiff's Section 349 claim is granted.


**d.    Plaintiff's claims under N.Y. Gen. Bus. Law § 350**

     Both parties cross-move for summary judgment on plaintiff's
claim that defendants have violated N.Y. Gen. Bus. Law § 350.
Section 350 proscribes "[f]alse advertising in the conduct of any
business, trade or commerce."  N.Y. Gen. Bus. Law § 350.  "The
standards for deceptive business practices under section 349 of
the General Business Law are substantively identical to those for
false advertising under section 350."  C.V. Starr & Co., Inc. v.
American Int'l Group, No. 06-CV-2157, 2006 WL 2627565, at *3 n.9
(S.D.N.Y. Sept. 14, 2006) (citing Goshen v. Mut. Life Ins. Co.,
98 N.Y.2d 314, 324, 774 N.E.2d 1190, 1195, 746 N.Y.S.2d 858, 863
n.1 (2002)).  Just as with plaintiff's Section 349 claim,

plaintiff has not met its burden in showing harm to consumers.

Additionally, plaintiff has not shown that defendants advertise.

Indeed, plaintiff's only allegation of advertising is that

defendants sell the candy in its original packaging – an act that

would seem to exemplify true or honest advertising.  Accordingly,

defendants' cross-motion with respect to plaintiff's Section 350

claim is granted.


**e.    Plaintiff's claims under N.Y. Gen. Bus. Law § 360-l**

Both parties move for summary judgment on plaintiff's claim

that defendants have violated N.Y. Gen. Bus. Law § 360-l.

Section 360-l proscribes conduct with a "[l]ikelihood of injury

to business reputation or of dilution of the distinctive quality

of a mark."  N.Y. Gen. Bus. Law § 360-l.  To prove a section

[360-l] dilution claim, a plaintiff must show that it owns a

distinctive mark and a likelihood of dilution.  <u>Pfizer, Inc. v.</u>

<u>Y2K Shipping & Trading, Inc.</u>, No. 00-cv-5304, 2004 WL 896952, at

*8 (E.D.N.Y. Mar. 26, 2004) (citing <u>Hormel Foods Corp. v. Jim</u>

<u>Henson Prods.</u>, 73 F.3d 497, 506 (2d Cir. 1996).

Defendants contend that plaintiff cannot maintain an action

under Section 360-l on grounds that it does not own any

trademarks.  "Only the federal 'registrant' or legal assignee has

standing to sue under Section 32(1) of the Lanham Act . . . or

for dilution under Section 360-l of the New York General Business

25

Law." <u>Prince of Peace Enter., Inc. v. Top Quality Food Market,</u> <u>LLC</u>, No. 07-CV-0349, 2007 WL 704171, at *3 (S.D.N.Y. 2007) (holding that an exclusive distributor had no standing to bring a claim of dilution against a competitor where it was unable to demonstrate a valid assignment of trademarks rights to itself); <u>see also</u> <u>In re Houbigant Inc.</u>, 914 F. Supp. 964, 990 (S.D.N.Y. 1995) (holding that an exclusive licensee that had no other trademark rights did not have standing to bring an action under N.Y. Gen. Bus. Law § 360-l [then § 368-d] against the trademark owner).

The standing inquiry for § 360-l is thus similar to that for Section 32(1) of the Lanham Act. Defendants are correct that plaintiff does not own any of the marks at issue. Furthermore, because plaintiff does not have status as a legal representative of United Confectioners under Section 32,[9] it does not have legal representative status under § 360-l.

Even if plaintiff had standing, defendants contend plaintiff's claim would fail because there can be no "likelihood of dilution" if defendants' goods are genuine. Dilution has been defined by the Second Circuit as "either the blurring of a mark's product identification or the tarnishment of the affirmative associations a mark has come to convey." <u>Deere & Co.</u>, 41 F.3d at 42 (internal quotations and citations omitted). "Blurring"

_____

[9] <u>See</u> Section 1a. supra.

26

typically involves "the whittling away of an established trademark's selling power through its unauthorized use by others upon dissimilar products." Id. at 43. "Tarnishment" typically occurs when "the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product." Id.

Plaintiff has not met its burden in demonstrating that defendants' goods either blur or tarnish its own goods. Plaintiff cannot argue blurring has occurred because it has not demonstrated any differences in the quality or quality control standards of defendants' goods, and thus cannot argue that the goods are dissimilar. Similarly, tarnishment cannot occur because if there are no differences in quality or quality control standards of defendants' goods, they cannot be of "shoddier quality" than plaintiff's goods. Accordingly, defendants' cross-motion with respect to plaintiff's Section 360-l claim is granted.

## f. Plaintiff's claim for tortious interference

Defendants move for summary judgment to dismiss plaintiff's claim of tortious interference with prospective business

relations.[10]

> The required elements of a cause of action for tortious
> interference with prospective business relations are as
> follows: (a) business relations with a third party;
> (b) the defendant's interference with those business
> relations; (c) the defendant acting with the sole
> purpose of harming the plaintiff or using wrongful
> means; and (d) injury to the business relationship.

Advanced Global Tech. LLC v. Sirius Satellite Radio, Inc., 15

Misc. 3d 776, 779, 836 N.Y.S.2d 807, 809 (Sup. Ct. New York

County 2007).  To demonstrate tortious interference with

prospective business relations it must be shown that defendants'

conduct "was undertaken for the sole purpose of harming

plaintiff, or that such conduct was wrongful or improper

independent of the interference allegedly cause thereby."  Jacobs

v. Continuum Health Partners, Inc., 7 A.D.3d 312, 313, 776

N.Y.S.2d 279, 280 (1st Dep't 2004).  "'Wrongful means' include

'physical violence, fraud or misrepresentation, civil suits and

criminal prosecutions, and some degrees of economic pressure;

they do not, however, include persuasion alone although it is

knowingly directed at interference with the contract.'" Advanced

Global, 15 Misc. 3d at 779, 836 N.Y.S.2d at 810 (quoting Guard-

Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183,191,

406 N.E.2d 445, 449, 428 N.Y.S.2d 628, 632 (1980)).  "Because

simple economic 'persuasion' does not qualify as wrongful means,

---

[10] Plaintiff has not moved for summary judgment on this
claim and has not addressed the claim in its briefs.

for economic pressure to be wrongful, it must be 'extreme and unfair.'" <u>Advanced Global</u>, 15 Misc. 3d at 779, 836 N.Y.S.2d at 810 (quoting <u>Carvel v. Noonan</u>, 3 N.Y.3d 182, 192, 818 N.E.2d 1100, 1105, 785 N.Y.S.2d 359, 364 (2004)).

The evidence presented does not support a claim of tortious interference with prospective business relations. Plaintiff does not present any specific instance of a prospective client whose relations were interfered with by defendants. Although plaintiff may have lost some business because defendants offered goods to prospective clients at lower prices, such conduct under these circumstances can hardly be considered "extreme and unfair." Accordingly, defendants' motion for summary judgment with respect to plaintiff's claim of tortious interference with prospective business relations is granted.

### (3)

### Defendants' Counter-Claims

Defendants assert counter-claims that plaintiff abused process, committed fraud on the U.S. Patent and Trademark Office ("USPTO"), violated anti-trust laws and has tortiously interfered with defendants' prospective business relations. Both parties cross-move for summary judgment on defendants' counter-claims.

**a.  Defendants' counter-claim for abuse of process**

Both parties cross-move for summary judgment on defendants' counter-claim that plaintiff has abused process by bringing an action to restrain defendants from selling candy.  "In New York, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003) (citation omitted).

Defendants have failed to demonstrate plaintiff's civil action is without legitimate justification or based primarily on a collateral objective.  Plaintiff has brought several causes of action based on trademark law with the economic justification of defending its exclusive distributorship.  Furthermore, although plaintiff's use of trademark law to defend its exclusive distributorship has not ultimately been successful, its claims did survive defendants' motion to dismiss.  See Trilini I. Defendants have also provided insufficient evidence to support their claim that plaintiff's sole collateral objective is to put defendants out of business.  Defendants even admit that the candy in dispute constitutes less than 21 percent of the defendants'

total business.[11]  Accordingly, plaintiff's cross-motion with
respect to defendants' abuse of process counter-claim is granted.


**b.   Defendants' counter-claim for cancellation of plaintiff's marks due to fraud on the USPTO**

Both parties cross-move for summary judgment on defendants'
counter-claim that plaintiff committed fraud on the USPTO by
registering two trademarks for the Krasnyi Oktyabr brands.
Defendants contend that plaintiff committed fraud by falsely
declaring to the USPTO that it had the exclusive right to use the
Krasnyi Oktyabr marks in commerce in the United States.
Section 37 of the Lanham Act, 15 U.S.C. § 1119, provides that a
district court may order the cancellation of a trademark
registration.  However, defendants do not have standing to seek
cancellation of the marks.  "A petitioner for cancellation must
show a real and rational basis for his belief that he would be
damaged by the registration sought to be canceled, stemming from
an actual commercial or pecuniary interest in his own mark."
Akhenaten v. Najee, LLC, 544 F. Supp. 2d 320, 332 (S.D.N.Y. 2008)

---

[11] Defendants stated that candy makes up 70 percent of their
total business.  Of that percent, only approximately 30 percent
comes from Russia.  Thus, Russian candy constitutes only 21
percent of their total business (70% x 30% = 21%).  Kerzhner Dep.
at 27-28.  Of this 21 percent, the candy in dispute makes up an
even smaller percentage of their total business, as defendants
stated that they import other brands of Russian candy in addition
to Krasnyi Oktyabr, Babayevsky and Rot Front.  M. Kerzhner Dep.
at 53-54.

(internal quotations and citations omitted).  Defendants have not shown that they have a commercial interest in the marks. Accordingly, they lack standing to bring a cancellation claim under 15 U.S.C. § 1119.

In addition, defendants have not shown that plaintiff had knowledge that its statement to the USPTO was false.  <u>Ushodaya Enter., Ltd. v. V.R.S. Int'l, Inc.</u>, 63 F. Supp. 2d 329, 335 (S.D.N.Y. 1999) (noting in the context of 15 U.S.C. § 1119 (cancellation of a mark) that "[m]isstatements in registration applications will cause cancellation only if they were made with knowledge of their falsity").  Without reaching the question of the validity of plaintiff's statement before the USPTO, defendants have failed to offer any evidence that plaintiff believed the statement to be false or acted recklessly. Furthermore, the evidence on record does not support defendants' assertion.  In ¶ 1.1 of the 1996 Agreement, Red October Moscow states that it grants plaintiff "the exclusive the [sic] License for use of the Trademarks on the territory on the United States." Furthermore plaintiff, Gregory Kachura, stated that he believed and continues to believe that Red October is the exclusive licensee of the Krasnyi Oktyabr marks.  Kachura Aff. ¶¶ 3-4. Accordingly, plaintiff's cross-motion with respect to defendants' counter-claim of fraud on the USPTO is granted.

**c.  Defendants' counterclaim for cancellation of plaintiff's marks for violation of antitrust law**

Both parties cross-move for summary judgment on defendants' counter-claim for cancellation of the marks for misuse.  In its brief, defendants allege that plaintiff violated § 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing and attempting to monopolize the premium candy market.  Although not addressed by either party in their briefs, as discussed above, defendants lack standing to bring an action for cancellation of the marks.

Even if defendants had standing, the claim would fail on the merits.  "The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power."  United States v. Grinnell Corp., 384 U.S. 563, 570-571 (1966).  Monopoly power is defined as "the power to control prices or exclude competition . . . [that] ordinarily may be inferred from the predominant share of the market."  Id.  For attempted monopolization "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).  "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market

33

and the defendant's ability to lessen or destroy competition in that market."  Id.

Plaintiff asserts that defendants have neither clearly defined the relevant market nor provided evidence of dominant share.  For the moment it will be assumed that defendants are attempting to define the relevant market as the Russian premium candy market.[12]  In order to define a relevant market defendants must first determine the boundaries of the product market.  "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."  Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).

Here, defendants have failed to meet their burden in showing a product market.  No evidence has been offered by defendants demonstrating that Russian premium candy constitutes a product market wholly inelastic to substitutes from premium candy imported from other parts of the world or manufactured domestically.  Even if defendants could make a showing that Russian premium candy constitutes a relevant market, they have failed to provide adequate evidence that plaintiff has a dominant share or has a high probability of achieving a dominant share in

---

[12] An interpretation of the "premium candy market" in the context of this case as anything broader than the market for Russian premium candy makes little sense since all other claims in this litigation pertain to Russian candy.

that market.  The record shows that there are other brands of Russian premium candy not covered by the 2005 Agreement.  M. Kerzhner Dep. at 53-54, 137-138.  Furthermore, defendants even claim to be the number one seller of Russian premium candy; it is, therefore, highly improbable that defendants' assertion that plaintiff is close to achieving a stronghold on the market is correct.  M. Kerzhner Dec. ¶ 26.  Defendants have failed to provide sufficient evidence to show that plaintiff has a monopoly in a relevant market or a high probability of attaining one.  Accordingly, plaintiff's cross-motion with respect to defendants' counter-claim under Section 2 of the Sherman Act is granted.


**d.   Defendants' tortious interference with business counter-claim**

Both parties cross-move for summary judgment on defendants' counter-claim of tortious interference with prospective business relations by plaintiff.  Defendants argue that by "improperly" bringing a suit on allegations it could not prove and obtaining an injunction, plaintiff has tortiously interfered with their prospective business relations.  The elements of a cause of action for tortious inteference with prospective business relations were discussed in connection with plaintiff's claim in section 2f., supra.

"Regardless of whether a lawsuit constitutes 'improper means,' parties who maintain civil suits are entitled to immunity

for doing so under the Noerr-Pennington doctrine of immunity so long as the litigation is not a 'sham'." Matushita Elec. Corp. v. Loral Corp., 974 F. Supp. 345 (S.D.N.Y. 1997) (citing Prof. Real Estate Invest., Inc. v. Columbia Pictures Ind., Inc., 508 U.S. 49, 60-61 (1993); Hirschfeld v. Spanakos, 104 F.3d 16, 18 (2d Cir. 1997)). The Supreme Court has outlined a two-part definition of "sham" litigation:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use of governmental process - as opposed to the outcome of that process - as an anticompetitive weapon.

Prof. Real Estate Invest., 508 U.S. at 60-61 (emphasis in original, internal quotations and citations omitted).

Thus in the present case, regardless of whether plaintiff's suit is "improper," plaintiff is immune to subsequent litigation, unless the litigation is shown to be a sham. Plaintiff's conduct does not meet either part of the sham test. First, although plaintiff's suit has proven unsuccessful, plaintiff's claims had enough merit to survive defendants' motion to dismiss. See Trilini I. Even though plaintiff's allegations have failed to

36

survive summary judgment, these allegations cannot be viewed as
objectively baseless or blatantly false based on the evidence
presented.  Second, even if plaintiff's case were without merit,
defendant has not shown that plaintiff is attempting to interfere
directly with its business relations by the use, not outcome, of
governmental process.  Here, defendants' claim rests wholly on
the outcome of process, namely interference with prospective
relations resulting from the court's issuance of a temporary
injunction.  Absent the injunction, however, no evidence has been
presented that plaintiff's choice to involve defendants in a suit
has interfered with its prospective business relations.
Accordingly, plaintiff's cross-motion with respect to defendants'
counter-claim of tortious interference with prospective business
relations is granted.


## Conclusion

For the foregoing reasons, defendants' motion for summary
judgment on plaintiff's claim under Section 32 of the Lanham Act
on grounds that plaintiff lacks standing is granted.  Defendants'
motion for summary judgment on plaintiff's claim under Section 43
of the Lanham Act on grounds that plaintiff not met its burden in
showing that the defendants' goods are subjected to different
quality control standards is granted.  Defendant's motions for
summary judgment on the common law unfair competition and

Sections 349, 350 and 360-l of the N.Y. General Business Law
claims on similar grounds that plaintiff has not met its burden
in showing that defendants' goods are subjected to different
quality control standards are granted.  Defendants' motion for
summary judgment on plaintiff's tortious interference with
prospective business relations claim on grounds that defendants'
conduct was not sufficiently "extreme" is granted.

Plaintiff's motions for summary judgment on defendants'
counter-claims of abuse of process, fraud on the USPTO, violation
of Section 2 of the Sherman Act and tortious interference with
prospective business relations on grounds of insufficient
evidentiary showing by defendants are granted.

The injunction against defendants is lifted.  As all claims
by both parties are disposed of by this order, the clerk of the
court is directed to close the case.


Dated: Brooklyn, New York
       September 25, 2008

                                   SO ORDERED:


                              _____/s/_____
                                   David G. Trager
                                   United States District Judge

38